State Court of Fulton County
**E-FILED**
25EV006800
12/22/2025 4:37 AM
Donald Talley, Clerk
Civil Division

## IN THE STATE COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION FILE NO: |
| | ) | |
| *v.* | ) | 25EV006800 |
| | ) | |
| CITY OF SANDY SPRINGS; | ) | |
| CITY OF SMYRNA; | ) | |
| OFFICER BRIAN CRISP; | ) | |
| "OFFICER 2," *name TBD*; | ) | JURY TRIAL DEMANDED |
| | ) | |
| | ) | |
| ASPIRE HOSPITALITY LLC; | ) | |
| AURO HOTELS GROUP; | ) | |
| HILTON WORLDWIDE HOLDINGS INC; | ) | |
| HILTON DOMESTIC OPERATING CO, INC. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## <u>PLAINTIFF'S FIRST AMENDED COMPLAINT</u>

**COMES NOW** Jane Doe ("Plaintiff") and files this amended Complaint against the City of Sandy Springs ("Defendant Sandy Springs"); City of Smyrna ("Defendant Smyrna"); Officer Brian Crisp, in his personal capacity ("Defendant Crisp"); Officer 2, *name TBD*, in his personal capacity ("Defendant Officer 2"); Aspire Hospitality, LLC ("Defendant Aspire"); Auro Hotels Group, Inc. ("Defendant Auro"); and Hilton WorldWide Holdings, Inc. and Hilton Domestic Operating Co., (together, "Defendant Hilton"), and shows this Court as follows:

1

## INTRODUCTION AND PRELIMINARY STATEMENT

1.    This is an action for damages, as well as for declaratory relief and injunctive measures, brought for violations of multiple state and federal laws following the outrageous physical, emotional and/or injuries inflicted on Plaintiff, initially by staff of the aforementioned Defendants operating and/or managing the Home2Suites By Hilton Hotel in Sandy Springs, Georgia ("Hotel") attendant to its breaches of contract and violation of state innkeeper laws, when staff of said Hotel abruptly evicted Plaintiff shortly following and in retaliation for her complaints about maintenance and sanitary issues at the Hotel, and defamed her by filing a false police report by untruthfully reporting that Plaintiff was "disturbing the peace" when in fact Plaintiff was quietly in her room as a fully-paid occupant at said Hotel during a stay governed by O.C.G.A. 43-21-3.1 of Georgia innkeeper law; but when, as a result of the false police report by, and malicious, retaliatory and/or discriminatory intent of staff of said Hotel, Plaintiff was falsely arrested and beaten; falsely and maliciously prosecuted; and falsely jailed by Sandy Springs for several days in the Smyrna Jail under extreme and inhumane conditions that not only amounted to unconstitutional punishment without due process, but which resulted in extreme physical and psychological distress to, and nearly death of Plaintiff. This all followed malicious actions of Hotel staff, for Plaintiff having done nothing more than asserting her legal rights and for having disabilities.

## THE PARTIES

2.     Plaintiff, provisionally referred to as Jane Doe (hereinafter "Plaintiff"), is a woman with disabilities under the Americans with Disabilities Act ("ADA"), and who has maintained a residence in Atlanta, GA since 2013.

3.     Plaintiff has stayed frequently at different hotels in recent years due to a series of water and mold intrusions affecting her Atlanta condominium that have rendered her home uninhabitable over an extended period.

4.     Plaintiff is a member of Hilton Honors rewards program and had Silver status at the time of the incidents giving rise to this Complaint.

5.     Defendant Sandy Springs is a municipal entity created and organized under the laws of the State of Georgia. Sandy Springs is authorized by law to maintain its police department. The responsibility of Sandy Springs over its police department extends to all matters with its police department, the conduct of all police department personnel, as well as its legal and contractual arrangements for incarceration services.

6.     Defendant Brian Crisp was an Officer of Defendant Sandy Springs police department during the relevant time period.

7.     Defendant "Officer Two", whose name is still TBD, having refused to provide his name and/or badge number during the occurrences described herein, was an Officer of Defendant Sandy Springs police department during the relevant

time period.

8.      Defendant Sandy Springs has a contract with Defendant Smyrna Jail to incarcerate individuals arrested by Sandy Springs police.

9.      Defendant Smyrna operates the jail where Plaintiff was incarcerated from June 26, 2023 through June 28, 2023.

10.     Defendant Aspire Hospitality, LLC is a domestic corporation that, upon reasonable information and belief, owns the Home2Suites By Hilton Hotel in Sandy Springs at 6110 Peachtree Dunwoody Rd., Atlanta, GA 30328 (hereinafter "the Hotel").

11.     Defendant Auro Hotels, LLC is a foreign corporation that, based upon reasonable information and belief, operates and/or manages the Home2Suites By Hilton Hotel in Sandy Springs, GA, and employed the Hotel staff during whose actions during the relevant time period gave rise to the claims in this Complaint.

12.     Defendant Hilton contracts with Defendant Aspire and/or Defendant Auro to operate the Home2Suites by Hilton Hotel, and to provide hotel services to guests/occupants under/at certain standards set forth by Hilton and expected by members of the Hilton Honors rewards program.

## JURISDICTION AND VENUE

13.    This action arises primarily under multiple state laws, including O.C.G.A. §

13-6-2; O.C.G.A. § 43-21-3.1; O.C.G.A. § 51-1-14; O.C.G.A. § 51-7-1; O.C.G.A.

§ 51-7-20; O.C.G.A. § 51-1-14; and O.C.G.A. § 51-7-40.

14.    This Court has concurrent jurisdiction over the federal claims brought under

this Complaint, which are secondary to the underlying state law violations that

gave rise to the additional claims set forth in this Complaint.

15.    Venue is proper because most of the Defendants are located in Fulton

County, and the events giving rise to these claims occurred in Fulton County.

## STATEMENT OF FACTS

**Plaintiff's stay/occupancy at the Hotel**

16.    At all relevant times, Plaintiff was a fully-paid occupant at said Hotel.

17.    When Plaintiff first checked into said Hotel early evening of June 16, 2023,

she informed Hotel staff of both her severe sleep disorder and noise sensitivity, and

confirmed she could have late checkout when departing as both a Hilton Honors

member and due to her sleep disability.

18.    Plaintiff also confirmed that she could extend day-to-day as necessary upon

the expiration of her four-day reservation, depending on her schedule and pending

travel plans.

19.    Staff confirmed that Plaintiff could indeed extend her stay as needed; that

late checkout would not be a problem; and that they would assign the most quiet room available. As with countless stays at other hotels, Plaintiff stayed at said Hotel in specific reliance on these assurances.

20.    Upon entering the room, Plaintiff observed that the room had not been carefully cleaned, as there were multiple facial hair shavings and nail clippings around the bathroom, as well as on the kitchenette countertop and on the sofa. Plaintiff reported this to desk staff, who told Plaintiff housekeeping was no longer in to do any touch-ups until the next day, but offered to move Plaintiff to another room albeit one that may not be as quiet as the assigned room near the end of the hall. So Plaintiff re-cleaned those areas herself with wipes, and stayed in that room.

21.    On June 20, 2023, Plaintiff's stay at said Hotel under her initial four-day reservation expired; her stay was extended when Hotel staff re-authorized her credit card and issued a renewed room key, and her stay at said Hotel converted to a day-to-day occupancy governed by O.C.G.A. § 43-21-3.1.

22.    Plaintiff brought in many belongings from the car, including housewares from her condominium and food items, to use them during her stay and/or to protect them from heat damage.

23.    Plaintiff renewed her day-to-day occupancy by reporting to the desk each evening that she would be staying for an additional day, and her credit card on file was continuously re-authorized and charged throughout her extended stay.

24.    Apart from when she stopped at the desk to continue her renewals every one-two-days, Plaintiff came and went mostly through a side door near her room, and had very limited interaction with hotel staff and guests.

25.    Throughout her stay, when Plaintiff was at the Hotel and in her room, she spent nearly all her waking hours sitting in front of a laptop and causing minimal sound (e.g., she did not have the television on or play loud music, etc.).

26.    On June 23, a week after she had initially checked into said Hotel, Plaintiff approached the Manager of said Hotel, Olivier Cugny, and asked him if the Hotel could offer a lower rate and/or adjustment for her stay because Plaintiff had stayed a week, comparable hotels had somewhat lower rates, and Plaintiff had re-cleaned the room when she had arrived a week prior. Mr. Cugny followed up that afternoon offering an adjustment based on these factors.

27.    Late on June 25, like she had done several times over the prior five days since her initial reservation had ended, Plaintiff reported to the front desk and confirmed with overnight audit staff Richard that she (Plaintiff) would be extending (yet another) day, and anticipated she would be leaving on Tuesday, June 27 at that point.

28.    Plaintiff also reported that there was a strong ammonia odor that had started emanating from the HVAC/air conditioning unit late that afternoon. Richard told Plaintiff he would update the morning staff accordingly.

29.     At approximately 11am on Monday morning June 26, despite Plaintiff

having extended her stay until June 27 as she had repeatedly done for nearly the

past week and despite the earlier assurance from Hotel staff of late checkout, a

woman who appeared to be housekeeping staff knocked on the door of Plaintiff's

room and told Plaintiff that she (Plaintiff) was supposed to check out.

30.     Plaintiff replied, through the door because she (Plaintiff) was not properly

dressed, that she had already (again) extended her stay through June 27 with front

desk staff Richard the evening prior, just as Plaintiff had repeatedly extended

throughout the past week.

31.     The woman said "okay" and left.

**Plaintiff's wrongful eviction from Hotel**

32.     At approximately 1pm, a woman whom Plaintiff had not recalled neither

seeing nor meeting before but who claimed she was a manager, named Lamonica

Mathis, told Plaintiff she needed to check out immediately.

33.     Plaintiff replied, in her regular voice from inside the room, she had already

extended her stay until tomorrow (Tuesday, 6/27) as she had confirmed with

Richard the evening prior, and with housekeeping staff who knocked on her door

two hours prior.

34.     Plaintiff also told Ms. Mathis that based on how she fatigued was feeling

given her documented sleep disorder, and with all her belongings in the room, it

would not be physically possible to check out immediately.

35.    From outside the door, Ms. Mathis threatened Plaintiff that she (Ms. Mathis) would have Sandy Springs police come if Plaintiff did not immediately leave.

36.    Plaintiff replied, still from inside the room her a regular voice, that she had a legal right to remain in the hotel until the next day, 6/27, when Plaintiff could actually check out, and that it was physically impossible for her to pack up and leave on the spot.

37.    Ms. Mathis did not accuse Plaintiff of insufficient payment, nor did she give Plaintiff a reason for trying to evict her on the spot.

38.    Several minutes later and shortly after 1pm, Officer Crisp and Officer Two, flanked by Ms. Mathis, banged on the door. Plaintiff opened the door, but still standing in the room. Officer Crisp repeated to Plaintiff that she (Plaintiff) had to check out immediately.

39.    As she had already told Ms. Mathis through the closed door, Plaintiff told the Officers that she had already extended her stay until 6/27/23, was fully paid, was permitted under the law to remain at the hotel for another day, and that it would be truly impossible for her to pack up in less than a few hours under the circumstances of Plaintiff not feeling well, as well as how much belongings she had in the room.

40.    Officer Crisp asked Ms. Mathis if Plaintiff could have a few more hours in

lieu of checking out the following day as scheduled or on the spot, but Ms. Mathis refused and repeated that Plaintiff needed to check out immediately. Ms. Mathis added that Plaintiff "is a problem," but did not cite anything that Plaintiff had allegedly done wrong.

41.     Ms. Mathis seemed to allude to Plaintiff's report the evening prior of the ammonia odor from the HVAC unit, as she did not mention anything else and Plaintiff had been in her room the entire time while at the hotel and had had minimal interaction with others.

42.     Ms. Mathis then told the Officers that someone else (purportedly) reserved that room, however, Plaintiff responded that even if the Hotel hypothetically made a mistake by releasing the room as available for someone else to check into, especially as Plaintiff had extended again as she had done almost daily for nearly the past week, that would not explain why Plaintiff herself needed to vacate the (entire Hotel) on the spot, or why the Hotel wouldn't simply explain the mix-up to the other (supposed) guest and assign them or her (Plaintiff) to an alternate room.

43.     Thus, Ms. Mathis' alleged explanation for why Plaintiff was being immediately evicted from the Hotel, purportedly to accommodate another guest, as opposed to retaliation against Plaintiff for having complained about some conditions, was not credible.

44.     Notwithstanding Plaintiff demonstrating that she was a fully paid guest and

had extended to the next day, and had a statutory right to remain at the hotel until receiving 24 hours prior notice to vacate, Officer Crisp and Officer Two then entered the room, and ordered Plaintiff to "pack up" in five minutes.

45.     Plaintiff reiterated it was humanly impossible for to pack up in a few minutes, and informed Officer Crisp and Officer Two that she not only was fatigued but had multiple disabilities that made packing up quickly, including but beyond panic attacks. Plaintiff also offered to show the Officers documentation, including of her disabilities that affected the speed at which Plaintiff could possibly pack up.

46.      Plaintiff repeatedly reminded the Officers she was fully paid and had a legal right to stay at the hotel until tomorrow as a statutory right, or at the very least until 2pm because that was the late checkout time Hilton offered to "elite" Hilton Honors members, but the Defendant Officers rebuffed that.

47.     Plaintiff has a long history, throughout her entire adult life, of trouble with packing, due to attention difficulties secondary to documented learning disabilities, and repeatedly received late checkouts from hotels providing extended time for packing; and received assistance from friends and relatives when moving residences, due to her known difficulties with packing. Plaintiff also has a documented history of panic attacks over several years prior to the occurrences giving rise to the instant Complaint.

48.    After Plaintiff explained to the Officers she has difficulty with packing, and has panic attacks and learning disabilities that cause her to be slow in packing, Officer Two asked Plaintiff if she was "mad". Plaintiff replied by reiterating that she was incapable of quickly packing up on the spot.

49.    But Plaintiff had in fact begun "packing up" insofar as she started by closing her laptop and placing her computer accessories into her handbag while pleading for the Officers to be reasonable under the circumstances.

50.    From the time the officers entered Plaintiff's hotel room a few minutes prior, curiously, they never ordered Plaintiff to "leave" the hotel, much less did they attempt to merely escort Plaintiff from the Hotel and order her to stay away; they had ordered her to "pack up" immediately.

**The false arrest of Plaintiff by Sandy Springs Officers**

51.    Nevertheless, after about five minutes of pleading with the officers to honor her legal right to remain at the hotel until the next day or help her arrange several hours to properly pack up, Plaintiff was handcuffed and told she was being arrested.

52.    Plaintiff did not yell, nor did she make any physical or verbal threats at the Hotel before being arrested.

53.    After they handcuffed Plaintiff, Officer Crisp searched through Plaintiff's bags and belongings in the Hotel room, but did not find any illegal or illicit items;

Plaintiff did not have nor was she accused of having anything illegal or contraband in her possession, or any weapons.

54.    The Officers did not show any warrant or provide the basis for arresting Plaintiff or searching her belongings under the circumstances given that she was fully paid, had a legal right under statute to receive 24-hours notice under her extended stay arrangement, and had quietly been in her room until the Officers arrived to evict her.

55.    While being handcuffed, Plaintiff did nothing to "resist" beyond instinctively jiggling her arms, as Plaintiff had never before been arrested nor handcuffed, and has specific preexisting pain and difficulties keeping her arms still. The Officers placed the handcuffs so tightly around Plaintiff's wrists that she immediately began developing bruises and welts.

56.    Plaintiff was given no opportunity to use her phone to call anyone, such as family, friends or any attorney.

57.    After being forcibly removed from the Hotel in handcuffs, without possession of her many belongings, Plaintiff was put into the back of a police car that had no air conditioning despite it being in the mid-90s outside, and placed onto a hard seat, exacerbating the severe pain Plaintiff was in. Plaintiff was informed she was being taken to jail, but Defendant Officers continued to refuse to procure an arrest warrant or even articulate what law(s) Plaintiff had actually violated.

58.     Plaintiff continued to demand justification and/or a warrant for her arrest, but the officers refused to provide such. In a state of disbelief at how such a false arrest could happen, Plaintiff reiterated that she had not broken any law, and told officers that they could look her up online to confirm she has no arrest or criminal history; nor could Plaintiff reasonably be considered a threat that justified the use of force much less being arrested and brought to jail.

59.     From the time she was removed from the Hotel, Plaintiff repeatedly demanded access to an attorney, but the Defendant Officers continuously ignored Plaintiff's request.

60.     Plaintiff informed the officers while being placed into the police vehicle that she also suffers from seizures and hypertension, and that not only was the arrest she was under entirely wrongful, but her life and health were at severe risk given her severe medical conditions, especially under the extreme physical conditions of the dangerous heat, and restraint of her body on a very hard surface in handcuffs.

61.     The Officers drove Plaintiff to the Northside Hospital emergency department, with no air conditioning on in the transport compartment of the police vehicle.

62.     Plaintiff was subjected to further public humiliation under false arrest by being brought into an emergency department in front of the public, including patients/visitors and staff of the hospital. Plaintiff had never before been

handcuffed or arrested, much less paraded around while handcuffed by officers in public and subject to stares and gazes from onlookers for such.

63.    But for the extreme mistreatment to which Plaintiff was being subjected, namely being handcuffed and made to sit on a very hard surface in a vehicle with no air conditioning when the temperature was in the mid-90s outside notwithstanding her medical conditions, Plaintiff would not have needed to go to an emergency department. However, the officers were not actually seeking treatment for Plaintiff, but rather as she ascertained, medical "clearance" to (wrongfully) jail her.

64.    The hospital administered an EKG on Plaintiff, which unbeknownst to Plaintiff until after her release and after Plaintiff subsequently obtained said medical records, revealed that Plaintiff was in a state of acute hypertension at the time the Officers brought Plaintiff to Northside hospital for medical "clearance".

65.    Nevertheless, Plaintiff was discharged from the Northside emergency department following the EKG without being given any more medication than her prescription beta blocker and antiseizure medication she takes daily, when not experiencing acute hypertension.

66.    The Officers had apparently removed Plaintiffs' medications, identification, and phone from her shoulder bag after searching through it. Monday afternoon right before the Officers escorted Plaintiff out of the emergency department was

the last medication Plaintiff was permitted to take before her (false) incarceration and continued wrongful detention over the next few days.

67.    Monday afternoon while at Northside was also the last time Plaintiff was given anything to drink for many hours to come, despite her health status and the extreme heat.

68.    Thereafter, the Officers walked her to a patrol car and told Plaintiff she would be taken to the Smyrna Jail; again this was despite of having (wrongfully) had her in custody for roughly four hours at that point, the Officers did not show her any arrest warrant or permit Plaintiff to call anyone, and rebuffed Plaintiff's repeated requests to be given access to an attorney.

69.    Upon learning Plaintiff would be driven from Northside Hospital to Smyrna during rush hour traffic, Plaintiff insisted that she at the very least be placed into a patrol car that had air conditioning in the transport cabin and be given more fluids.

70.    Plaintiff, while handcuffed, walked to the curb next to the patrol car and sat on the curb right next to the car while continuing to insist on access to an attorney and a patrol car that would have A/C on in the cabin compartment.

71.    Although Plaintiff strongly protested the extreme wrongfulness and inhumanity of the patently false arrest and physical abuse to which she was being subjected to by the Officers, at no time did Plaintiff physically or verbally threaten the Officers or anyone else.

72.     The Officers called for backup, but did not request a patrol vehicle with working air conditioning in the rear compartment notwithstanding the conditions of extreme heat and humidity and long drive they intended to subject Plaintiff to.

73.     A third officer (also male, name unknown) arrived several minutes later, and attempted with Officer Crisp and Officer Two to convince Plaintiff to go into the police vehicle rear cabin, but without assuring that the air conditioning would be on, as in a vehicle ordinarily.

74.     After Plaintiff repeated for a few more minutes her insistence on being given access to an attorney and/or at the very minimum a patrol car with the air conditioning on before further transport, Officer Crisp and Officer Two forced Plaintiff up from the curb and slammed her against the side of the patrol vehicle they were insisting she enter, resulting in further bruising and welts across her arms and body on top of those from the tight handcuffs on her.

75.     That was despite never showing an arrest warrant to Plaintiff and despite Plaintiff not having broken any law, and regardless of the effects of subjecting any detainee, much less someone with documented hypertension, seizures, and chronic pain among other documented physical and psychological conditions to a long car ride without air conditioning with weather in the 90s and while the person is tethered to a very hard surface as was the "seat" in the passenger compartment of the patrol vehicle.

76.    In furtherance of the continued false arrest and detention, Officer Crisp drove Plaintiff from Northside Hospital to Smyrna Jail, without the air conditioning on in the passenger cabin, despite the extreme heat and humidity and Plaintiff's health status.

**The detention in and conditions at the Smyrna Jail**

77.    Upon booking Plaintiff into Smyrna Jail for (false) incarceration, Plaintiff was subjected to a full-body pat down.

78.    Plaintiff again demanded, to the first correction officer with whom she interacted, access to an attorney but was rebuffed.

79.    Plaintiff was given her phone for roughly one minute to ostensibly retrieve contacts stored in her phone; but she did not have service or internet access and was not permitted to retrieve any contact information for attorneys or much less to call anyone such as attorneys or family.

80.    Plaintiff requested water but was denied such for hours, despite the extreme heat to which Plaintiff had been subjected and risk not just of dehydration, but severe complications of dehydration on hypertension and seizures.

81.    Shortly after 6pm approximately, Plaintiff was placed into a holding cell near the main entrance to the jail and directly opposite an office with several correction officers.

82.    The holding cell was approximately four by eight feet and entirely concrete

from floor to ceiling, save the solid metal door with a tiny window less than one foot by one foot toward the top of the door into the hallway.

83.    The holding cell was filthy with dried up remnants of what appeared to be blood spots, mucus, and potentially fecal matter, as well as dried food spots, across the walls and floor of the cell.

84.    The cell had one metal bench approximately four by 1.5 feet in dimension to be shared by all inmates, but otherwise was entirely bare with no sink, toilet or any other fixture.

85.    The cell had absolutely no window to the outside, and there was no clock visible to inmates to permit them the ability to keep track of or maintain any sense of time.

86.    Having zero natural light, the holding cell was very brightly lit with a fluorescent light, which remained on continuously.

87.    Soon after Plaintiff's placement into the cell, Plaintiff was joined in the cell by with three other female detainees; five other female detainees came and went from the cell throughout the next several hours.

88.    One of the fellow cell mates, a young woman who said she was arrested for (alleged) shoplifting at a local WalMart and that it was not her first time "going through the system" as she put it, told Plaintiff she (fellow detainee) was alarmed by the extent of bruising and welts that covered nearly the entirety of Plaintiff's

arms and hands, and that she (fellow detainee) had not seen that level of bruising on an inmate before.

89.     Plaintiff replied that she developed all the bruising and welts after not only handcuffs were on extremely tightly, but following being beaten and slammed against a patrol car after insisting that the Officers have the air conditioning on during the ride to the Jail.

90.     Unlike the Plaintiff's experience, the fellow inmate told Plaintiff that the air conditioning was on in the vehicle in which she was taken to the Jail.

91.     Plaintiff, who was extremely sleep-deprived due to her (documented) sleep disorder, was having heart palpitations, and was having pre-seizure "auras", informed her cell mates of the possibility she might have a seizure, and asked them to ensure she didn't hit her head on the concrete or metal in the event of a seizure.

92.     After several hours, Plaintiff and fellow inmates in the cell were each given a 10-oz cup of tap water, but which contained black specks of dirt. This was the first water Plaintiff was given for hours since she departed Northside hospital.

93.     Several hours after being booked into the Jail, the five other inmates who had been in the cell with Plaintiff throughout the evening left, and Plaintiff was remained entirely alone, being given no way to communicate with anyone on the outside whether an attorney, family or friends, and was not offered any bail option.

94.     Although Plaintiff had been given roughly a minute to write down phone

numbers stored on her phone before being placed into a cell, Plaintiff was not given access to a working telephone to actually call anyone, whether family members or an attorney.

95.    Plaintiff repeatedly asked jail staff to give her some—any—paper reading materials, such as a book, magazine or newspaper, to "pass the time", but the correction officers refused to.

96.    Upon sensing that she would not be getting out of the Jail anytime soon, and already having pre-existing mental and physical distress, and now being entirely alone in the cell without any connection to the outside world, to the time, and/or to anything such as reading materials to pass the time, Plaintiff began crying.

97.    Soon after she started crying, a correction officer moved Plaintiff into solitary confinement in a cell deeper inside the jail, further away from both Jail staff and other inmates.

98.    As with the original holding cell, Plaintiff was placed into a cell roughly four by eight feet, with zero window to the outside world made entirely of a concrete, with the only fixture other than the bare walls and floor being a metal bench roughly four by 1.5 feet.

99.    Despite it seeming to be after midnight at that the time Plaintiff was placed into solitary confinement, Plaintiff was denied any more water and was offered no food from the time she had originally been booked shortly after 6pm.

100.    The Jail/correction staff further refused to give Plaintiff her medications for her hypertension, panic attacks and seizures, as well as denying her any more water; nor did they permit her access to any nurse, physician or health staff, putting Plaintiff at high risk of death or serious bodily injury if she had a seizure and hit her head on the concrete and/or metal bench in the cell she was held in alone.

101.    Not only was Plaintiff put into solitary confinement in a filthy cell with a fluorescent light continuously on, at roughly midnight on Monday night, 6/26, with no window, clock or any sense of time or connection to the outside world at all, or any reading materials or items to use to "pass the time." Plaintiff was furthermore given no mattress or any (safe and/or clean) surface to sleep on.

102.    From the time Plaintiff was booked into Jail at approximately 6pm on 6/26/23 until "breakfast" time the next morning, Plaintiff was not offered any food. The only food she had been given since her initial arrest soon after 1pm was a packet of saltines while at Northside Hospital. Plaintiff was not offered any food for well over 12 hours, and only one cup of (dirty) water during the same period.

103.    Left in such conditions of solitary confinement, having no idea if/when she would be released from the Jail, if she even managed to stay alive, given the complete disregard of the law already by the Hotel, Sandy Springs, and the Jail; also fearing she would have a seizure and/or heart attack under such extreme jail conditions and given her preexisting health status, Plaintiff's crying evolved into

screaming from the increasingly extreme physical and mental distress she was experiencing.

104.   During that night, for the first time, large clumps of Plaintiff's hair started falling out from her head.

105.   The longer she was kept in solitary confinement in a filthy cell with no window or connection to the outside world, or even a bed to sleep on, Plaintiff was increasingly overcome by the fear that death from a seizure and/or heart attack was imminent, and even more scary to Plaintiff was the fear that that she would soon die in the Jail without being able to settle her affairs, or without anyone ever even finding out what happened to her ability to contact anyone was entirely cut off.

106.   Plaintiff not only had not just no sense of time or connection to the outside world such as through a window to look outside, but Plaintiff was entirely ignored from roughly midnight until approximately 7am the next morning, when a Jail Sargent went into Plaintiff's cell to ask why Plaintiff was crying and screaming.

107.   Plaintiff responded that not only was her arrest and incarceration false and shocking, but she was at imminent risk of death from not having access to her medications for her epilepsy, hypertension and panic attacks.

108.   The Sargent said he would try get a nurse to visit Plaintiff, but no such nurse or health worker ever came to Plaintiff's cell, and nor did that Sargent return until hours later.

109.   Later that day, the Sargent returned and said he was (supposedly) still trying to get medical staff to address Plaintiff's health conditions and need for medication, but for the entire remainder of her incarceration, Plaintiff never received her medications nor was she ever evaluated by any health worker.

110.  The Sargent did, but briefly, move Plaintiff out of solitary confinement back to the holding cell closer to the entrance, where Plaintiff was permitted limited interaction with other inmates. While in a shared cell, Plaintiff neither cried nor screamed like she did when she was in solitary confinement.

111.   However, soon thereafter, without any explanation nor any incident, Plaintiff was moved back to solitary confinement, seemingly after the Sargent left for the day. Plaintiff remained in solitary confinement the rest of her incarceration, without her medications or any visit by health staff.

112.   Plaintiff was never given an actual mattress to sleep on in the solitary cell. Rather, in the middle of her second night at the jail, a correction officer had offered to move Plaintiff to a shared jail cell with a bunk bed. However, the officer confirmed that such beds were narrow and were not available with any railings that would prevent Plaintiff from falling and suffering severe injury in the event Plaintiff would have a sleep seizure, which Plaintiff experiences roughly 1-2 times per year and which sometimes results in Plaintiff falling out of bed onto the floor and hitting her head.

113.   During her entire incarceration at the Smyrna Jail between early evening on June 26, 2023 until she was transported to the Sandy Springs Courthouse the morning of June 28, 2023, Plaintiff was denied all access to outside light, recreation, reading and/or writing materials, and was held in a bare cell with no proper bed and/or mattress notwithstanding her severe documented physical and mental health conditions.

114.   Irrespective of the direct legal applicability of such, and apart from Plaintiff having never even committed any crime to justify her arrest much less incarceration, the conditions under which Plaintiff was incarcerated at the Smyrna Jail constituted torture under the 1984 "Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment", as well as unconstitutional punishment without any due process.

**Plaintiff's release from the jail on 6/28/23**

115.   Having been given no indication of if/when Plaintiff would appear before a judge, Defendants having already broken numerous laws already, Plaintiff was abruptly informed, having had no sense of the time that it apparently was the morning of June 28, that she would soon be transported in an approximately an hour to the Sandy Springs courthouse, and should prepare to leave.

116.   After a long process of multiple detainees being restrained in handcuffs and

chains, Plaintiff and other detainees were loaded into a large van, again with very hard even painful surfaces to sit on, and driven to the Sandy Springs courthouse.

117.    Upon appearing before a judge in Sandy Springs court during roughly late morning on June 28, 2023, Plaintiff requested the court appoint an attorney due to Plaintiff's limited income at the time.

118.    Plaintiff was appointed an attorney, who promptly secured Plaintiff's release from pretrial detention upon a showing Plaintiff was not reasonably considered either a public safety or flight risk.

119.    Thereafter, after asking different officers outside the courthouse, Plaintiff found a (female) Sandy Springs Officer who volunteered to escort Plaintiff back to the Hotel to try retrieve her belongings.

120.    During the ride from the Sandy Springs Courthouse back to the hotel during the early afternoon of June 28, the Officer escorting Plaintiff on that occasion did turn on the air conditioning in the cabin portion of the vehicle, unlike Defendant Officer Crisp had when transporting Plaintiff to the Jail.

121.    Upon Plaintiff asking that Officer if the air conditioning usually works in the cabin portion of patrol cars and/or if it is usual for the a/c to be on or off during transports, the Office stated that the air conditioning would ordinarily be on during transports in hot weather, such as it was on when Plaintiff was escorted to the

Hotel to retrieve her belongings.

**Plaintiffs attempt to retrieve her belongings from the Hotel on 6/28/23**

122.   Upon returning to the Hotel with said Officer and requesting through the Officer to retrieve all her belongings from the Hotel, the Hotel returned only Plaintiffs three suitcases and shoulder bag.

123.   The Hotel confiscated, withheld and/or otherwise refused to return the numerous boxes and many other household and food-related items Plaintiff had brought into the Hotel room during her extended stay, given that Plaintiff was staying there due to displacement from her condominium and had numerous belongings from her residence at the time of her wrongful eviction and arrest.

124.   Plaintiff requested that the Officer ask the Hotel if she (the Officer) could review video footage of the hallway right outside the room Plaintiff had stayed in to ascertain what the Hotel did with all of Plaintiff's belongings.

125.   The Officer went back into the Hotel lobby while Plaintiff was waiting outside nearby, and returned shortly thereafter that she would be unable to review any such footage.

126.   Thereafter, severely sleep-deprived and incapable of driving or traveling for much distance, Plaintiff checked into a different hotel in an adjacent suburb.

127.   Plaintiff immediately opened her bags and found that several electronic items, namely a new (yet unprogrammed) Android phone, and brand new, backup

pair of custom headphones, had been removed from one of her suitcases where she had specifically and carefully stored such items.

128.   Plaintiff promptly created a contemporaneous list of all her items the Hotel had stolen, confiscated and/or otherwise failed to return.

**The dismissal of charges against Plaintiff by Sandy Springs in August 2023**

129.   On August 2, 2023, once Plaintiff's court-appointed attorney had opportunity to meet with the Sandy Springs prosecutor, and showed the evidence to the prosecutor—the very evidence the Defendant Officers refused to examine or consider on June 26, 2023—that Plaintiff was a fully-paid occupant at the Hotel, had a statutory right to be given 24-hours notice prior to being ordered to leave under O.C.G.A. § 43-21-3.1, and that Plaintiff had been in her room and completely quiet until Ms. Mathis abruptly and wrongfully ordered to vacate on the spot. Plaintiff had not in fact caused any "public disturbance", and based on the evidence, Defendant Sandy Springs dismissed the charges for which Plaintiff was (falsely) arrested and jailed.

130.   Thereafter, on December 26, 2023, Plaintiff issued an ante litem notice to the City of Sandy Springs informing Defendant Sandy Springs of her pending claims against them.

131.   As of the date of this Complaint, Defendant Sandy Springs never replied to Plaintiff's December 26, 2023 letter.

## <u>COUNT I – BREACH OF CONTRACT UNDER O.C.G.A. § 13-6-2 AS TO DEFENDANTS AURO, ASPIRE, AND HILTON</u>

132.    Plaintiff repeats and hereby incorporates by reference each of the paragraphs above.

133.    As a Hilton Honors member who had previously stayed at numerous other Hilton properties, Plaintiff reasonably relied on the guaranteed satisfaction standards Hilton purported to maintain, and a higher level of maintenance and of treatment of guests by staff at properties that Hilton contracted with to bear the Hilton name.

134.    As a Hilton Honors member with Silver Status who had previously stayed at numerous other Hilton properties, Plaintiff reasonably relied on  its 2pm checkout time that was generally extended to Hilton Honors member during the relevant time period; and the assurances of the Hotel staff that she would be able to continuously extend her reservation until such date as Plaintiff determined she would check out.

135.    However, Defendants Auro, Aspire and Hilton breached their express and implied agreements regarding Plaintiff's extended-stay and late checkout rights, causing Plaintiff to suffer substantial damages.

## COUNT II – VIOLATION OF GEORGIA INNKEEPER LAW O.C.G.A. § 43-21-3.1 AS TO DEFENDANTS AURO, ASPIRE, AND HILTON

136.   Plaintiff repeats and hereby incorporates by reference each of the paragraphs above.

137.   Pursuant to O.C.G.A. § 43-21-3.1, Plaintiff's occupancy at the Hotel shifted from a pre-paid reservation into a daily, ongoing extended stay effective June 20, 2023.

138.   Because Plaintiff was otherwise fully paid and was not in fact engaging in disorderly conduct, Plaintiff had a statutory right to receive at least 24 hours' notice prior to being asked to vacate the Hotel. Defendants' refusal and failure to follow this basic statutory obligation resulted in extreme harm and damages.

## COUNT III – VIOLATION OF ADA Title III, 42 U.S.C. § 12181, AS TO DEFENDANTS AURO, ASPIRE AND HILTON

139.   Plaintiff incorporates by reference each of the preceding paragraphs above. Plaintiff informed Hotel Defendants of her severe sleep disorder upon check in. Plaintiff simultaneously requested 2pm late checkout based upon her disability status in addition to her Hilton Honors status at that time.

140.   The Hotel is a place of public accommodation under Title III of the Americans with Disabilities Act and is legally obliged to provide reasonable disability accommodations to the public, namely guests, occupants and patrons.

141.   When Ms. Mathis demanded at approximately 1pm that Plaintiff

immediately leave the Hotel when Plaintiff was in her room, Plaintiff reminded

Ms. Mathis through the door of her medical conditions and disabilities that

necessitated significant time before she could reasonably pack up her belongings,

after Ms. Mathis wrongfully ordered her to leave on the spot.

142.   Nevertheless, after being falsely told Plaintiff was disturbing the peace,

before Defendant Officers proceeded to arrest Plaintiff, when Plaintiff repeated to

the Officers and Ms. Mathis that Plaintiff has numerous disabilities that made it

impossible for Plaintiff to pack up the amount of belongings Plaintiff had in less

than several hours, and notwithstanding Plaintiff's statutory and contract right to

have remained at the Hotel for one more day, Defendant Officer Crisp asked Ms.

Mathis if she would grant Plaintiff a few hours to pack up and leave. But despite it

being almost an hour from the late checkout time of 2pm previously granted to

Plaintiff, and despite Plaintiff's known disabilities, Ms. Mathis refused to provide

Plaintiff with a basic accommodation of extra time of even a few hours for Plaintiff

to pack up as a reasonable accommodation for her disabilities.

143.   The denial of a reasonable accommodation and refusing to give Plaintiff

several hours to pack up and leave despite her documented disabilities, instead

being ordered to pack on the spot, also constituted a violation of the ADA by the

Hotel Defendants and contributed to the false arrest at issue and which resulted in

extreme harm and damages to Plaintiff to be proven at trial.

## COUNT IV – DEFAMATION UNDER O.C.G.A. § 51-5-4
## AS TO DEFENDANTS AURO AND ASPIRE

144.   Plaintiff hereby incorporates by reference all preceding paragraphs.

145.   Ms. Mathis was an employee of said Hotel and Defendant(s) Auro
Hospitality and/or Aspire Hospitality at the relevant time.

146.   Defendants Auro and Aspire, through Ms. Mathis, made false, malicious and
unprivileged statements to law enforcement regarding Plaintiff "disturbing the
peace" to trigger an unlawful arrest.

147.   Despite being in her room and taking a nap at the time she was abruptly
ordered to check out of the Hotel at approximately 1pm on June 26, 2023, and
despite doing nothing more than telling Hotel staff, namely Ms. Mathis, from
behind the closed door of her Hotel room, that she (Plaintiff) had extended her stay
until June 27, 2023 and had a legal right to remain at the Hotel until the latter date,
Ms. Mathis filed a false and defamatory police report against Plaintiff when Ms.
Mathis reported to Sandy Springs Police that Plaintiff was creating a disturbance
and/or engaging in "disorderly conduct", when Plaintiff was quietly in her room, as
she was legally entitled pursuant to statutory and contract law.

148.   Ms. Matthis' false police report was not only made by phone but was
published on the Sandy Springs website with Plaintiff's name, for anyone to see.

149.   Plaintiff suffered severe harm, including but far beyond significant public
humiliation and emotional distress, as a result of the defamation by Defendants.

## COUNT V – CONVERSION OF PERSONAL PROPERTY UNDER O.C.G.A. § 51-10-1 AND § 43-21-8 AS TO DEFENDANTS AURO, ASPIRE, AND HILTON

150.   Plaintiff hereby incorporates by reference each of the paragraphs above.

151.   After wrongfully causing Plaintiff to be ejected from the Hotel and causing Plaintiff to be falsely arrested, Defendants Auro, Aspire and/or Hilton withheld, transferred, misappropriated, converted and/or stole Plaintiff's personal belongings and property following Plaintiff's removal from the Hotel instead of safeguarding and returning all of Plaintiff's property.

## COUNT VI – FALSE ARREST UNDER O.C.G.A. § 51-7-1 AS TO DEFENDANTS AURO, ASPIRE, AND SANDY SPRINGS

152.   Plaintiff hereby incorporates by reference all of the paragraphs above.

153.   Said Defendants, without proper justification, together maliciously and wrongfully initiated and utilized judicial process to retaliate against Plaintiff for having complained about some conditions at the Hotel and/or for merely asserting her legal rights to remain at the Hotel. In so doing, Defendants had no probable cause that Plaintiff actually committed any crime, but instead acted out of retribution and with malice.  Defendants intended to and in fact did inflict severe physical, emotional, financial and other harm onto Plaintiff.

## COUNT VII – MALICIOUS PROSECUTION UNDER O.C.G.A. § 51-7-40 AS TO DEFENDANTS AURO, ASPIRE, AND SANDY SPRINGS

154.   Plaintiff hereby incorporates by reference each of the paragraphs above.

155.   Said Defendants, without proper justification, maliciously and wrongfully initiated and utilized judicial process to retaliate against Plaintiff for complaining about conditions at the Hotel. In so doing, Defendants intended to and in fact did inflict severe physical, emotional, financial and other harm onto Plaintiff.

## COUNT VIII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER O.C.G.A. § 51-1-6 AS TO DEFENDANTS AURO, ASPIRE, AND SANDY SPRINGS

156.   Plaintiff hereby incorporates by reference each of the paragraphs above.

157.   Defendants Auro, Aspire, and/or Sandy Springs, in apparent retaliation for Plaintiff having complained about conditions at the Hotel, for asserting her legal rights to receive notice before eviction and/or for requesting reasonable accommodations for her disabilities under ADA and/or for other malicious reasons, intended to inflict emotional distress on Plaintiff and acted with extreme malice toward Plaintiff . In so doing, Defendants intended to and in fact did inflict extreme harm and severe physical, emotional, reputational, pain and other injury onto Plaintiff to degrees and in amounts to be determined at trial.

## COUNT IX– FALSE ARREST UNDER
## 42 U.S.C. 1983 AND THE FOURTH AMENDMENT
## AS TO DEFENDANTS SANDY SPRINGS, AND TO OFFICER CRISP AND
## OFFICER TWO IN THEIR INDIVIDUAL CAPACITIES

158.   Plaintiff hereby incorporates by reference each of the paragraphs of this

Complaint above.

159.   Defendants Officer Crisp and Officer Two are, or were at the time of the

events at issue, employed by the City of Sandy Springs.

160.   At the time of her arrest, Plaintiff was a fully-paid occupant of the Hotel and

had been in her room silent until she was abruptly ordered to leave despite the

notice requirements of the Georgia Innkeeper Statute; Plaintiff's contractual right

to remain at the hotel an additional day per her fully-paid status and regular daily

extensions; and her additional right to have received several hours to pack up due

to her right to late checkout as well as reasonable disability accommodations.

161.   Before her arrest, Plaintiff was never accused of doing anything that was

reasonably considered "disorderly" and/or "disturbing the peace" at the Hotel aside

from remaining in her room and not packing up her (extensive) belongings in the

room on the spot.

162.   Plaintiff reminded Defendant Officers of her statutory and contractual rights

to a day's prior notice before eviction, and her right to reasonable accommodations

under the ADA, such as extra time to pack due to her physical and mental

disabilities that necessitated extra time even when she was scheduled to check out.

163.   Aware that Plaintiff was a fully-paid occupant, had extended daily for over the past week prior, and had a statutory right to notice prior to eviction and a contractual right to remain at the hotel, and learning of her disabilities, no reasonable officer could have believed in good faith that Plaintiff was committing a crime for not packing up and leaving the Hotel room on the spot under the aforementioned circumstances. Defendants Officer Crisp and Officer Two knowingly and willfully acted in the absence of probable cause and with malice in arresting Plaintiff in her Hotel room.

164.   At the time of the arrest, any objectively reasonable law enforcement officer would have known that causing a citizen to be arrested and imprisoned under the circumstances to which Plaintiff was subjected violated the Fourth Amendment.

165.   As the direct and proximate result of Defendant Officers Crisp and Two's violation of Plaintiff's Constitutional rights, Plaintiff has suffered damages, including physical harm, mental and emotional suffering, damages to her Constitutional rights and her reputation, and loss of liberty, in an amount to be proven at trial before a jury.

**COUNT X – UNREASONABLE AND EXCESSIVE USE OF FORCE AS TO DEFENDANTS SANDY SPRINGS, AND TO OFFICER CRISP AND OFFICER TWO UNDER § 1983 AND THE FOURTH AMENDMENT.**

166.    Plaintiff hereby incorporates by reference paragraphs 32 through 76 above of this Complaint in their entirety.

167.    After arresting Plaintiff and taking her to the hospital and becoming very aware of Plaintiff's numerous medical conditions, Defendant Officers Crisp and Two attempted to force Plaintiff into a transport cabin with no air conditioning late in the afternoon when it was in the 90s for roughly an hour's ride.

168.    Notwithstanding the patently false arrest, at no point did Plaintiff attempt to flee. Plaintiff was fully restrained in handcuffs and experiencing severe fatigue due to her medical conditions, worsened by the extreme heat. Plaintiff was merely sitting on the curb immediately next to the patrol vehicle while demanding the air conditioning be turned on in the transport cabin prior to transporting Plaintiff. But Defendant Officers refused.

169.    Instead of merely turning on the A/C and/or requesting an alternate vehicle with functional A/C in the event the A/C was truly not operational given the very hot weather, and reassuring Plaintiff they would have the A/C on, and although Plaintiff was not attempting to flee or exhibit any threatening behavior, Defendant Officers picked Plaintiff up from the curb, and violently slammed her against the side of the vehicle, causing widespread and severe bruises and welts across her

body and exacerbating Plaintiff's preexisting pain from her medical conditions.

170.   The resulting bruises covering much of Plaintiff's arms and hands, as well as other parts of her body, were so widespread and severe as to startle other inmates whom Plaintiff encountered while incarcerated in the Smyrna Jail, including those who had prior experience with arrests and detention unlike Plaintiff.

## COUNT XI – BATTERY AS TO DEFENDANT OFFICERS CRISP AND TWO UNDER O.C.G.A. § 51-1-13 IN THEIR INDIVIDUAL CAPACITIES

171.   Plaintiff hereby incorporates by reference each of the above paragraphs in their entirety.

172.   Defendant Officers Crisp and Two unlawfully and proximately caused Plaintiff's body to be touched in a harmful, offensive, painful, and cruel manner.

173.   Plaintiff did not authorize said touching.

174.   Defendant Officers Crisp and Two proximately caused resulting injuries to Plaintiff in an amount to be proven at trial, including physical injuries and emotional suffering.

175.   Defendant Officers Crisp and Two acted with malice, including with the intent to cause Plaintiff harm and injury and having done so with the knowledge that Plaintiff had not engaged in unlawful conduct while asserting and exercising her legal rights, such that they are not entitled to official immunity. Defendants acted with the intent to retaliate and inflict harm on Plaintiff, as opposed to making

a good faith mistake.

## COUNT XII - UNCONSITUTIONAL PUNISHMENT WITHOUT DUE PROCESS UNDER THE FOUREENTH AMENDMENT AND 42 U.S.C. § 1983 AS TO SANDY SPRINGS AND DEFENDANTS OFFICER CRISP AND OFFICER TWO IN THEIR INDIVIDUAL CAPACITIES

176.   Plaintiff hereby incorporates by reference each of the above paragraphs in their entirety.

177.   At all relevant times, Plaintiff was a pretrial detainee, and protected by the Fourteenth Amendment from being subjected to punishment without due process.

178.   Wholly aside from issues of false arrest and false imprisonment, Defendant Officers and Sandy Springs subjected Plaintiff to punishment and inhumane conditions during their transport of Plaintiff to Smyrna Jail in ways that did not serve a legitimate government or law enforcement objective.

179.   Despite being aware of Plaintiff's severe medical conditions, including hypertension, the Officers insistence on transporting Plaintiff in an inmate cabin with no air conditioning when the ambient outside air was in the 90s, and beating Plaintiff for sitting on the curb and insisting the officers assure her they would have the A/C on—instead of merely turning on the A/C and/or requesting a patrol vehicle with operational A/C in the cabin—demonstrated Defendant Officers' malice and intent to punish and/or break Plaintiff.

180.   Defendant Officers' conduct as described above was motivated by the kind

of ill-will, malice, conscious indifference and/or reckless disregard for the consequences of their actions and Plaintiff's rights that justifies an award of punitive damages to Plaintiff against the Officers and/or against their employer Defendant Sandy Springs in amount to be determined by a jury at trial.

## COUNT XIII - UNCONSITUTIONAL DEPRIVATION OF LIBERTY AND PUNISHMENT WITHOUT DUE PROCESS UNDER THE FOUREENTH AMENDMENT AND 42 U.S.C. § 1983 AS TO DEFENDANTS SANDY SPRINGS SMYRNA

181.   Plaintiff hereby incorporates by reference each of the above paragraphs in their entirety.

182.   The conditions under which Defendants Sandy Springs and Smyrna incarcerated Plaintiff, as detailed in the above paragraphs 77 - 114, served no legitimate government objective and constituted punishment without due process.

183.   Keeping Plaintiff in solitary confinement for most of the period spanning Monday evening through Wednesday morning, denying Plaintiff any and all reading and/or writing materials to pass the time, such as books, newspapers and/or magazines, and denying Plaintiff any recreation or time out of the cell whatsoever, even though Plaintiff left in a filthy and bare cell with no sense of time, no means of connecting to the outside world, no safe much less clean surface to sleep on notwithstanding Plaintiff's epilepsy, denying Plaintiff her medications and any

medical care, Plaintiff anything more than a total of 20 to 30 ounces of water daily, and not even a paper to read or write on, only served to exacerbate Plaintiff's extreme distress leading Plaintiff to continuously cry and scream.

184.    The shocking conditions to which Plaintiff was subjected during her pretrial detention following her false arrest not only amounted to torture, but evidenced intent by Defendants Sandy Springs and Smyrna to punish Plaintiff and retaliate against her for asserting her legal rights, with utter indifference to Plaintiff's Fourteenth Amendment rights.

## COUNT XIV - DELIBERATE INDIFFERENCE TO THE MEDICAL NEEDS OF DETAINEES IN VIOLATION OF THE FOUREENTH AMENDMENT PURSUANT TO 42 U.S.C. § 1983 AS TO DEFENDANTS SANDY SPRINGS AND SMYRNA

185.    Plaintiff hereby incorporates by reference each of the above paragraphs.

186.    The acts of Defendants Sandy Springs and Smyrna of not just withholding Plaintiff's prescription medications, including for her hypertension and her seizures, while simultaneously withholding all access to medical care from Plaintiff during the entirety of her pretrial incarceration, manifested deliberate indifference to Plaintiff's medical needs in further violation of the Fourteenth Amendment.

**COUNT XV – Violation of the Americans with Disabilities Act Title II, 42 U.S.C. § 12131, AS TO DEFENDANTS SANDY SPRINGS AND SMYRNA**

187.   Plaintiff incorporates by reference all preceding paragraphs. As public entities, Defendants discriminated against Plaintiff by failing to accommodate her disabilities during her incarceration in violation of Title II of the ADA.

188.   Plaintiff repeatedly informed jail staff of being prone to seizures, especially when asleep, and her need for a bed or mattress where she would not risk falling from and/or hitting her head on the concrete and sharp metal surfaces throughout the jail cell.

189.   Despite Plaintiff's known epilepsy status and severe physical distress, Jail staff made no attempt to secure a mattress or bed for Plaintiff to sleep on where she would not be at risk of falling until Plaintiff between Monday evening and Wednesday morning.

190.   The Jail's failure to even try provide a safe bed or sleep surface to Plaintiff given her documented disabilities amounted to a failure to accommodate under Title II of the ADA in addition to violations of the Fourteenth Amendment by Defendants Sandy Springs and Smyrna.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands a TRIAL BY JURY and the following relief:

(1)    Judgment in favor of Plaintiff against all Defendants under the multiple Counts of this Complaint;

(2)    Compensatory and punitive damages to the maximum extent under all applicable laws as determined by a reasonable jury, for a sum greater than $500,000 from the Defendants together, based on the extreme malice and nature and extent of the abuse and violations of rights and laws by the multiple Defendants, with division of such award to be allocated according to each Defendant's level of culpability;

(3)    Attorney's fees and costs of this action;

(4)    Declaratory relief to the maximum extent under all applicable state and federal laws;

(5)    Injunctions against Defendants Sandy Springs and Smyrna Jail to abstain from violating the legal rights of individuals, especially as to refraining from false arrests; ceasing mistreatment of all detainees upon arrest; and remediating the conditions of the jail(s) in which they incarcerate detainees and the treatment of such detainees.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this December 22, 2025,

/s/

██████████ a/k/a Jane Doe

Address:    375 Ralph McGill Blvd., Apt. 903
            Atlanta, GA 30312
Phone:      (404) 939-2076

43